Corrine P. Murphy, Esq.
Nevada Bar No. 10410
**PI VEGAS**
9440 W. Sahara Ave., Ste. 245
Las Vegas, NV 89117
Telephone: (702) 919-5555
Email: corrine@pivegas.com
and
Ofelia Markarian, Esq.
Nevada Bar No. 14736
**OFELIA MARKARIAN LAW GROUP, PLLC**
611 S. 6th Street
Las Vegas, NV 89101
Telephone: (725) 529-5259
Email: om@ofeliamarkarianlaw.com
*Counsel for Plaintiff MONICA McLEAN, Individually and as Special Administrator of The Estate of JOEY FREDERICK McLEAN, II*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| MONICA McLEAN, individually and as Special Administrator of the ESTATE OF JOEY FREDERICK McLEAN, II,<br><br>Plaintiff,<br><br>vs.<br><br>CITY OF LAS VEGAS, a political subdivision of the State of Nevada; BRYSEN KIM, individually; MATT COONAN, individually; MEL SEGOVIA, individually; MATTHEW MYERS, individually; TOM LACKAS, individually; JOEY PASKEY, individually; RICK HUNT, individually; and TASIA CURTIS, individually,<br><br>Defendants. | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff MONICA McLEAN, individually as the surviving spouse and heir of decedent JOEY FREDERICK McLEAN, II, and as the duly appointed Special Administrator of the Estate of JOEY FREDERICK McLEAN, II (collectively, "Plaintiff"), by and through her attorneys of record, Corrine P. Murphy, Esq. of the law firm PI VEGAS, and Ofelia

Markarian, Esq. of the law firm OFELIA MARKARIAN LAW GROUP, PLLC, hereby complains and alleges as follows:

## I. PARTIES

1. Plaintiff MONICA McLEAN (referred to individually as "Monica") is the surviving spouse and heir of JOEY FREDERICK McLEAN, II ("Decedent" or "Joey"). Monica brings this action individually, as Decedent's surviving spouse and heir, and as Special Administrator and Personal Representative of the Estate of JOEY FREDERICK McLEAN, II ("Estate" collectively referred to as "Plaintiff").

2. Letters of Administration appointing Monica as Special Administrator and Personal Representative of the Estate were issued in Probate Case No. P-26-130421-E.

3. Joey was a resident of Clark County, Nevada.

4. Joey was employed as a maintenance worker in Defendant CITY OF LAS VEGAS's Public Works Department and Downtown Maintenance Section.

5. Defendant CITY OF LAS VEGAS ("City") is a political subdivision of the State of Nevada.

6. The City employed Joey, Defendant BRYSEN KIM ("Defendant" or "Kim").

7. Upon information and belief, Kim is a resident of Clark County, Nevada.

8. The City controlled the work yard, work assignments, employee transfers, workplace-safety practices, Human Resources practices, disciplinary procedures, and workplace-violence responses.

9. Kim was Joey's City coworker.

10. Defendant MATT COONAN ("Defendant" or "Coonan") was Joey's foreman and direct supervisor.

11. Upon information and belief, Coonan is a resident of Clark County, Nevada.

12. Defendant MEL SEGOVIA (“Defendant” or “Segovia”) was a City supervisor with authority over Joey, Kim, and Coonan.

13. Upon information and belief, Segovia is a resident of Clark County, Nevada.

14. Defendant MATTHEW MYERS (“Defendant” or “Meyers”) was a City official involved in, or responsible for, decisions concerning Joey’s requested transfer or protective reassignment. Myers is sued in his individual capacity.

15. Upon information and belief, Meyers is a resident of Clark County, Nevada.

16. Defendant Tom Lackas (“Defendant” or “Lackas”) was a City management employee with knowledge of Joey’s reported safety concerns and conflict with Kim.

17. Upon information and belief, Lackas is a resident of Clark County, Nevada.

18. Defendant JOEY PASKEY (“Defendant” or “Paskey”) participated in discipline directed at Joey.

19. Upon information and belief, Paskey is a resident of Clark County, Nevada.

20. Defendant RICK HUNT (“Defendant” or “Hunt”) was a City official.

21. Upon information and belief, Hunt is a resident of Clark County, Nevada.

22. Defendant TASIA CURTIS (“Defendant” or “Curtis”) was a City Human Resources representative who participated in employment actions involving Joey.

23. Upon information and belief, Curtis is a resident of Clark County, Nevada.

24. Collectively, the individual city employee defendants are referred to herein as “City-Employee Defendants” or “Supervisory-Defendants”.

25. At all relevant times, the City-Employee Defendants acted under color of state law.

26. Plaintiff sues each individual Defendant for that Defendant's own acts and omissions, including intentional, malicious, oppressive, reckless, deliberately indifferent, and unconstitutional conduct.

27. At the times alleged herein, the City-Employee Defendants were the actual, apparent, implied, or ostensible agents of Defendant the City. Therefore, Defendant the City is responsible for the injuries and damages caused to the Plaintiff under the theory of respondeat superior, NRS § 41.130 and to the extent applicable NRS § 42.007.

## II. JURISDICTION AND VENUE

28. This Court has original jurisdiction over Plaintiff's claims arising under the Constitution and laws of the United States. See 28 USCS § 1331.

29. This Court has original jurisdiction over this action to redress deprivations, under color of state law, of rights secured by the Constitution and laws of the United States. See 28 USCS § 1343.

30. This action seeks damages and other relief under 42 U.S.C. § 1983 for the deprivation of Decedent's Fourteenth Amendment right to substantive due process and life.

31. This Court has supplemental jurisdiction over Plaintiff's Nevada-law claims because those claims arise from the same workplace events, conduct, injuries, and death as the federal civil-rights claims and form part of the same case or controversy. See 28 USCS § 1367.

32. This Court has personal jurisdiction over Defendants because it is upon information and belief they reside in Nevada, and they work in Nevada.

33. Venue is proper in this District because the events and omissions giving rise to the claims occurred in Clark County, Nevada.

34. Plaintiff alleges that the 1983 causes of action contained herein do not require exhaustion of administrative remedies. Eggleston v. Stuart, 495 P.3d 482, 486 (Nev. 2021) ("a party generally is not required to exhaust administrative remedies before filing a § 1983 civil rights claim"). Regardless, Plaintiff affirmatively alleges that she submitted a "claim" pursuant to NRS § 41.036 and § 41.039 to The City on or about September 24, 2026 with no response from The City as of the date of this filing. Further, a right to sue letter was issued by the Nevada Equal Rights Commission on September 29, 2026, under NERC No. 0109-24-00014L.

35. Plaintiff pleads her Nevada-law tort claims against the City and any City Employee Defendants only to the extent those claims are cognizable under Nevada law and subject to any applicable governmental immunity or limitation.

## III. FACTUAL ALLEGATIONS

**Joey's Employment and Prior Protected Advocacy**[1]

36. Joey Frederick McLEAN, II ("Joey") was employed by the City of Las Vegas Public Works Department, Downtown Maintenance Section ("DMS"), as a CDL-licensed Maintenance Worker.

37. He and Defendant Kim were both covered by the City Employees Association ("CEA") Collective Bargaining Agreement.

38. Before the events at issue, Joey had a documented history of workplace-safety advocacy.

39. He previously filed an OSHA-related complaint that resulted in an investigation in which his allegations were substantiated.

[1] Topic headings are for reference only and are not allegations requiring a response.

40. That prior protected activity marked Joey as a "problem employee" among certain supervisors, notwithstanding strong performance.

41. Joey's advocacy also generated hostility from Defendant Myers, against whom Joey had prevailed in an earlier discrimination/OSHA matter.

42. Joey – at the time of his murder - was also actively organizing to bring the Teamsters into the City workforce and publicly challenging OSHA compliance and CBA terms, which further antagonized Myers and other City supervisors and managers.

**Deterioration of the Relationship; Steroid Distribution and Firearm at Work**

43. For roughly one (1) year prior to February, 2026, Joey and Kim worked together on the same City truck and had a friendly working relationship.

44. The relationship deteriorated after Kim began using anabolic steroids.

45. Joey believed that anabolic steroids were being dealt at the workplace.

46. Joey believed that Kim was not the only City employee using anabolic steroids.

47. Joey believed Defendant Coonan — Joey's direct foreman — was the source, distributing/selling steroids to Kim and other crew members.

48. In this same workplace where there was an on-the-job anabolic steroid dealer, Kim was carrying a concealed firearm to work.

49. Kim's carrying of a concealed firearm on City property was widely known on the crew.

50. In 2025, Kim left his firearm in the DMS bathroom and had to be recalled to retrieve it — upon information and belief that is a fact the City's own initial assessment acknowledges.

**Chronology of Joey's Protected Complaints and the City's Responses**

51. The below chronology demonstrates the volume, specificity, and escalation of Joey's protected reports to supervisors, Human Resources, the City Auditor, and Nevada OSHA, and the temporal and causal connection between those reports and each adverse action the City took against him.

52. On February 13, 2026, Joey verbally reported to Segovia that Kim was using anabolic steroids and carrying a concealed firearm on City property while on duty.

53. City policy and protocol required Segovia to contact the Las Vegas Metropolitan Police Department, secure the firearm, and arrange drug testing.

54. These were operational duties, not discretionary functions.

55. Segovia did none of these things.

56. Instead, within approximately four (4) hours, Segovia disclosed Joey's report to foreman Defendant Coonan — the alleged steroid source — after which Kim was observed running to his truck in apparent panic, consistent with concealment of contraband or a firearm.

57. From February 23–24, 2026, Joey made verbal and written safety reports to HR concerning firearms, drugs, escalating aggression, workplace violence, and his fear for his safety.

58. In February of 2026, Joey submitted an urgent transfer request to City management, asking to be transferred off the shift with Kim.

59. In his written request, Joey wrote in part, "[i]f I could put this off until next shift bid I would, unfortunately this is urgent. I need the city to be flexible and help."

60. There were numerous open positions to which Joey could have been reassigned.

61. The relationship between Joey and Kim continued to deteriorate - Kim become more threatening towards Joey.

62. As Joey's requests to be transferred of the shift with Kim were denied, Joey was trying to navigate and manage Kim.

63. In one exchange, Joey told Kim 'keep it aloha,' meaning keep it peaceful.

64. Joey was not looking, nor did he want, any type of confrontation or conflict with Kim.

65. Joey used his finger to write in the dust on a work truck Kim was using the phrase 'bullying is no pono,' meaning bullying is not good.

66. Again, Joey was trying to de-escalate the situation and ask Kim to stop bullying and threatening him.

67. When asked about these encounters, Joey admitted to his supervisors they occurred.

68. On February 27, 2026, one day after Joey's protected disclosures, HR issued a formal Notice of Proposed Disciplinary Action citing Joey's phrases "keep it Aloha" (Hawaiian: be peaceful) and "bullying is no pono" (not good).

69. For these two instances, Joey – the victim - was written up.

70. The discipline was signed by Defendant Paskey.

71. The write-up acknowledged that the worst documented alleged bullying by Joey against Kim on record was Joey asking Kim to stop bullying him.

72. Upon information and belief, Paskey had a history of workplace issues and was later allowed to resign in lieu of termination for a coercion-related matter that he was involved in.

73. As a result of these incidents, Joey was placed on paid administrative leave.

74. Joey was relieved he did not have to see Kim as he was very fearful of him.

75. Although the easiest, cheapest and safest solution would have been to grant Joey's requests for a different shift, rather than write him up and place him on paid administrative leave.

76. From February 25 thru March 16, 2026, Joey remained on paid administrative leave.

77. No mediation, threat assessment, or protective transfer was implemented before Joey's return to work.

78. On March 20, 2026, after his return to work, Joey reported violations of the Heat Illness Prevention Plan, referencing OSHA regulations, lack of acclimatization following his 21-day absence, and the need for breathable PPE to supervisor Defendant Coonan.

79. Coonan denied Joey breathable PPE and required Joey to wear a dense poly-cotton uniform despite heat-stress symptoms.

80. From March 20 thru April 6, 2026, Segovia assigned Joey to Truck 3868 and to Truck 4276.

81. Truck 3868 had a broken tailgate that would not latch and a nonfunctional tarp.

82. Truck 4276 had a broken tailgate and missing safety chain and the tailgate failed on a public roadway on April 6, 2026.

83. These assignments were to defective trucks, meant to retaliate against Joey.

84. As a CDL holder personally liable for pre-trip safety certifications, Joey refused to sign off without repair documentation for these defective trucks.

85. From March 21 thru April 7, 2026, Segovia selectively enforced the uniform policy against Joey while other employees violated the same policy without consequence, assigned Joey to crews to which he did not belong, denied him daily instructions, and administratively isolated him from normal working conditions, including by assigning him to a solo truck, even though policy required that any solo crew-member have a team leader assigned with them.

86. In March of 2026 Joey submitted multiple complaints, allegations, and requests to Human Resources, several concerning Kim, but also addressing his treatment overall.

87. On March 24, 2026, Joey made his first formal report to City Auditor Bryan Smith.

88. Joey reported firearms, drugs, violent behavior, heat hazards, and mechanical hazards.

89. On March 31, 2026, Joey made his Second Formal Report to the City Auditor.

90. Joey reported retaliation, unsafe assignments, and continued safety violations.

91. On April 6, 2026, Kim made another threatening statement to Joey.

92. On April 6, 2026, immediately following a threatening statement from Kim, Segovia left Joey alone with Kim and later confined the two men together in a 14-passenger van.

93. Joey was scared and concerned for his safety.

94. On April 7, 2026, Joey made his third formal report to the City Auditor.

95. Joey reported new threats, the defective trucks he was assigned to, forced proximity to a violent coworker, and ongoing retaliation.

96. On April 8, 2026 Joey submitted a Nevada OSHA Whistleblower Complaint No. 26-103.

97. Joey's whistleblower complaint alleged retaliatory administrative leave, proposed discipline, exposure to workplace-violence hazards, unsafe assignments, denial of PPE, selective uniform enforcement, and administrative isolation following his protected disclosures, invoking NRS 618.445, NRS 613.340, and OSHA § 11(c).

98. On April 13, 2026, Joey was subjected to further adverse action in the form of written discipline.

99. HR issued a written disciplinary write-up against Joey, later cited by NVOSHA in its administrative closure.

100. From March 20 thru June 8, 2026, Joey continued shared scheduling with Kim.

101. Joey and Kim were scheduled to work the same shift on 12 occasions between March 20 and April 13, 2026; on 10 dates between April 19 and May 4, 2026; and on 5 dates between June 1 and June 8, 2026.

102. The City relied on separate task assignments rather than physical separation or protective reassignment.

103. Joey and Kim were required to continued to report to the same work yard and clock in at the same location.

104. On April 20, 2026, NVOSHA emailed Joey regarding his initial whistleblower complaint, advising, in part:

> We cannot investigate your complaint due to the following:
>
> 1. The administrative leave claim is untimely.

2. The claimed harassment does not rise to the level of harassment and is more appropriately handled by safety enforcement.

3. Your employer had a legitimate reason for writing you up on 4/13/2026.

I am recommending your complaint be administratively closed, which means it will not be investigated, the complaint will not be forwarded to the Respondent, and you will not have the opportunity to object or request a review of NVOSHA's decision.

105. From May 8 thru 31, 2026, Joey was subjected to further adverse action by way of forced personal leave and unpaid time for refusing defective truck.

106. Joey refused to operate the defective trucks he was assigned to.

107. The City advised Joey that he would be sent home if he did not operate the vehicles.

108. Joey became increasingly scared for his personal safety, noting not only where his complaints and requests for shift changes not being addressed, he was being isolated and subjected to unsafe work conditions.

109. The City required Joey to use personal leave and sent him home without pay on May 8, 9, 10, 11, 15, 16, 17, 18, 22, 23, 24, 29, 30, and 31, 2026.

110. On June 8, 2026, Kim submitted additional HR complaints against Joey.

111. The HR Manager referred Kim to a behavioral-health clinician and to the Acting Public Works Director but took no protective action for Joey.

112. Kim directed his hostility at Joey specifically, not at the DMS workforce generally.

113. No report, complaint, or observation known to Plaintiff describes Kim threatening, following, or confronting any City employee other than Joey.

114. Joey's response was the repeatedly ask to be transferred out.

115. On June 8, 2026, Kim also stared Joey down in the parking lot; when Joey gestured a "shaka" peace sign, Kim escalated by tailgating Joey and cutting into his lane on public roads.

116. On June 9, 2026, Joey submitted another Nevada OSHA Whistleblower Complaint.

117. In his communications with OSHA, Joey described the situation, in part, as follows:

> May 8, 9, 10, and 11: I was not permitted to work and was required to use my personal leave involuntarily after raising safety concerns.
>
> May 15, 16, 17, and now 18: I have been placed on what is effectively a constructive suspension each day. I have reported for duty willing, able, and ready to work, but I have been sent home without pay solely due to my good-faith safety refusal on Unit 3417. This is not the standard operating procedure for the City of Las Vegas, where safety refusals are normally addressed through reassignment or verification, not unpaid removal from duty.
>
> Today, I again exercised a safety refusal due to unresolved brake-related concerns. I requested to ride with my assigned crew or be given an alternative safe assignment, and these requests were denied. I was instructed to leave the premises without pay.
>
> During today's discussion (Witness: John Gomez), Mel stated that he had seen the fleet report for Unit 3417 but refused to allow me to view it. I explained to him that the brake fluid reservoir cap had visible dust on it, indicating it had not been recently opened or serviced. I also noted that the rotors still appeared worn and that the rear brakes are drum brakes. These observations give me reasonable apprehension that the vehicle has not been inspected by a certified mechanic. I also stated that the City's unwillingness to produce the fleet/mechanic report raises additional concern. I restated that under City SOP, I am legally responsible for the vehicle I operate on public right-of-ways. Without documentation confirming that the brake system was inspected and cleared by a certified mechanic, I cannot legally or safely operate a vehicle that I previously reported for brake malfunction that could lead to mechanical failure. I was again instructed to use personal leave and to leave the premises, resulting in another unpaid constructive suspension.

118. From June 8 thru 10, 2026, Kim communicated with the Deputy City Manager and the Acting Public Works Director, arranging a June 15, 2026 meeting.

119. On June 11, 2026, the Acting Public Works Director signed a second Notice of Proposed Disciplinary Action against Joey — potentially including termination — scheduled for hand-delivery on June 12, 2026.

**Additional Supervisor and HR Misconduct**

120. Defendant Coonan repeatedly called Joey a "felon" — street slang for "snitch" — in the presence of City management, including Lackas, publicly identifying Joey as the source of drug and firearm reporting.

121. Connan had also previously called Joey J-OSHA, referring to Joey reporting issues to OSHA, again publicly identifying Joey as a problem and a 'snitch'.

122. Defendant Myers responded to Joey's repeated transfer requests only by citing "shift bid procedure," refusing to authorize an emergency transfer, and writing that granting one would "open the door for one 'emergency transfer' and we will have this same situation occur after every vacated position . . . . They both chose their shift, they need to learn to work together and have an amicable relationship."

123. The statement was dismissive and kept Joey in a highly volatile and dangerous work environment.

124. The only partial response to any of Joey's concerns was where Defendant Lackas gave Joey his personal cell number and told Joey to call if Kim caused further problems.

125. That was not protective action, and obviously based on the outcome, provided absolutely no safety to Joey.

126. Upon information and belief, Joey’s supervisors and managers used this escalating conflict with Kim as a path to progressive discipline that they hoped would ultimately provide grounds to terminate Joey.

**Joey's Prophecy and the City's Inaction**

127. In a recorded meeting with supervisors, Joey warned: "[i]f anything happens to me, my wife is going to sue."

128. In a formal HR complaint, Joey wrote: "I am being actively stalked by Brysen Kim outside of work hours. . . .The combination of his delusions, steroid use, access to a firearm, and stated gang affiliation makes his threats credible, and his behavior dangerously unpredictable . . . I am afraid for my life."

129. Despite him pleading for his safety, his supervisors took absolutely no protective action – except for providing a cell phone number.

130. Taking any protective action in Joey’s favor – to which he was not only entitled, but in desperate need of - would have scuttled their plan to fire Joey.

**The Fatal Shooting on June 12, 2026**

131. On June 12, 2026, just after 6:00 a.m., Joey arrived at work.

132. Again, Joey was not separated from Kim in any way, so to clock-in Joey had to go to the same clock and employee area as Kim.

133. As Joey was preparing to start his shift, Defendant Kim ran up to and punched Joey in the face, knocking him to the ground.

134. After Joey was down on the ground, Kim kept beating and kicking Joey.

135. It was a savage beating.

136. Joey was on the ground moaning and unable to protect himself.

137. Joey was no threat to Kim in any way, as he as on the ground, incapacitated.

138. Some co-workers approached and tried to intervene, but Kim was relentless in his attack on Joey.

139. Then Kim pulled out a gun – upon information and belief the very gun Joey warned the City about on multiple occasions.

140. As Joey was lying on the ground, battered and incapacitated, Kim unloaded his gun into Joey.

141. Joey died at the scene.

142. Following the shooting, Defendant Kim admitted to a homicide detective that human resources had "months to fix this but did nothing."

143. Before Joey's death, City officials had actual knowledge of the escalating conflict between Joey and Kim; Joey's repeated safety reports; Kim's firearm possession, alleged drug or steroid use, violence, intimidation, and threats; Joey's stated fear for his life; and Joey's repeated requests for protective reassignment.

144. The City's own internal assessment shows HR received complaints, opened investigations, and had a scheduled disciplinary hearing pending — yet the two men were still required to report to the same worksite and clock in at the same location.

**The Administrative Aftermath**

145. The City of Las Vegas publicly acknowledged the killing as a "serious incident of workplace violence" in the public works department.

146. NVOSHA administratively closed Joey's retaliation and unsafe working conditions complaints on June 24, 2026, - ***two weeks after Joey's murder*** – finding no grounds.

147. On September 29, 2026, the Nevada Equal Rights Commission issued a right to sue letter, advising, in part, "[t]his is to inform you that I concur with the Compliance

Investigator's conclusion that the evidence did not meet the legal criteria for establishing that discriminatory acts occurred. Your case filed with the NERC is considered closed.”

148. Joey’s widow, Monica, Plaintiff herein, received both letters following Joey’s murder.

**Workers' Compensation Does Not Bar These Claims**

91. Plaintiff's § 1983 claims arise under federal law, and Nevada's industrial-insurance exclusivity provisions do not bar them.

92. Kim's assault and shooting of Joey were deliberate intentional torts committed for personal reasons unrelated to any City work purpose.

93. Plaintiff's claims against Kim are not claims against an employer for a workplace accident.

94. Plaintiff's claims against the Supervisory Defendants rest on intentional conduct.

95. That conduct includes Segovia's disclosure of Joey's report, Coonan's public "snitch" labeling, and the deliberate decisions to keep Joey within Kim's reach after Joey reported a firearm and threats.

**The City's Failures Were Operational, Not Discretionary**

95. Plaintiff’s negligence claims not challenge any City policy choice.

96. Plaintiff alleges that City employees failed to carry out mandatory duties that already existed, including, but not limited to:

a) the City's firearm and drug protocol requiring law-enforcement notification, securing of the firearm, and drug testing;

b) the City's workplace-violence policy;

c) the City's confidentiality requirements for safety reports;

d) the City's solo-crew policy requiring a team leader; and

e) the City's Heat Illness Prevention Plan.

96. City employees also undertook protective action and then performed it negligently.

149. Human Resources opened investigations into Joey's complaints and Lackas told Joey to call him if Kim caused further problems, which did not actually protect Joey from Kim who was a very credible threat to Joey's safety.

**COUNT I**

**STATE-CREATED DANGER: FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS, 42 U.S.C. § 1983**

**(On behalf of the Estate, against Segovia, Coonan, Myers, and Lackas, individually)**

150. Plaintiff incorporates Paragraphs 1 through 149.

151. The Fourth Amendment has been held applicable to the States and individual state actors, a process called incorporation, pursuant to the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Mapp v. Ohio, 367 U.S. 643, 655, 81 S. Ct. 1684, 1691 (1961) (incorporation of Fourth Amendment).

152. Pursuant to 42 USC § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

153. Segovia, Coonan, Myers, and Lackas acted under color of state law.

154. Each used authority the City gave him over Joey's assignments, schedule, workplace, or reports.

155. The Due Process Clause of the Fourteenth Amendment protects Joey's right to life and bodily integrity against state actors who affirmatively place him in danger that the actors created or increased.

156. Count I does not rest on any Defendant's failure to investigate, failure to protect, or failure to provide a safe workplace.

157. Count I rests on each Defendant's own affirmative acts, which left Joey in a more dangerous position than he would have occupied had the Defendant not acted.

158. Kim posed an actual and particularized danger to Joey, not a general risk to the workforce.

159. Kim's threats, stalking, tailgating, and complaints targeted Joey alone, as alleged herein.

160. Kim carried a firearm at work, as City personnel knew from the 2025 bathroom incident and from Joey's February 13, 2026 report.

161. Segovia acted affirmatively, with knowledge, including but not limited to, as follows:

a) On February 13, 2026, Segovia told Coonan about Joey's report of Kim's firearm and steroid use. On April 6, 2026, Segovia left Joey alone with Kim and assigned the two men to share a 14-passenger van.

b) On February 13, 2026, Segovia knew Kim carried a firearm at work and knew Joey's report implicated Coonan. On April 6, 2026, Segovia also knew Kim had just threatened Joey, knew Joey had sought a transfer, and knew Joey feared for his safety.

c) Segovia's disclosure exposed Joey as the source of a report against an armed coworker and gave that information to the foreman implicated in the

same report. Segovia's April 6 assignments placed Joey, with no supervisor present, in an enclosed vehicle with the coworker who had just threatened him.

162. A reasonable supervisor in Segovia's position would have known that revealing a firearm report to the implicated foreman, and then confining the reporter with the armed subject of the report, exposed Joey to retaliation and violence.

163. Coonan acted affirmatively with knowledge, including but not limited to, as follows:

a) Coonan publicly called Joey a "felon" and "J-OSHA," identifying Joey to Kim and the crew as the employee who reported Kim;

b) Coonan knew when he spoke that Joey had reported Kim's firearm and steroid use, and that Joey's report implicated Coonan; and

c) Coonan's statements gave Kim public confirmation, from Kim's own foreman, that Joey was the informant. The statements also signaled that management treated Joey as a "snitch" rather than a protected reporter.

164. A reasonable supervisor in Coonan's position would have known that branding an employee a "snitch" in front of the armed coworker the employee had reported invited retaliation and violence against that employee.

165. Myers acted affirmatively, with knowledge, including but not limited to, as follows:

a) Myers denied Joey's urgent transfer request and directed that Joey remain on Kim's shift. Myers gave administrative reasons in writing: avoiding future transfer requests and requiring Joey and Kim to "learn to work together";

b) When Myers decided Joey's request, Myers knew the facts alleged in herein; and

c) Myers's decision required Joey to report alongside Kim on at least 27 scheduled shifts between March 20 and June 8, 2026, although open positions existed that would have separated the two men.

166. A reasonable official in Myers's position would have known that ordering a frightened reporter to keep sharing shifts with the armed coworker he had reported exposed that reporter to violence.

167. Lackas acted affirmatively, with knowledge, including but not limited to, as follows:

a) Lackas heard Coonan label Joey a "felon", had supervisory authority to stop that conduct, and allowed it to continue;

b) Lackas knew of Joey's safety concerns and his conflict with Kim, as shown by Lackas's offer of his personal cell number for Joey to call if Kim caused further problems; and

c) By allowing Coonan to keep identifying Joey as a "snitch" in front of management, Lackas ratified that conduct and signaled to the crew that management condoned it.

168. A reasonable official in Lackas's position would have known that ordering a frightened reporter to keep sharing shifts with the armed coworker he had reported exposed that reporter to violence.

169. Segovia, Coonan, Myers, and Lackas each recognized the substantial risk that Kim would harm Joey, or that risk was so obvious that each of them must have recognized it. Each acted anyway.

170. None of these Defendants faced an emergency requiring a split-second decision.

171. Each had days or weeks to deliberate.

172. Myers put his reasons in writing.

173. Kim attacked Joey on June 12, 2026 at the clock-in area that the City required both men to use.

174. Kim used a firearm that, on information and belief, Joey had reported to Segovia four months earlier.

175. The danger each Defendant created or increased was a substantial factor in Kim's assault on Joey and in Joey's death.

176. Segovia's and Coonan's acts identified Joey to Kim as the person who reported him. Segovia's and Myers's acts kept Joey within Kim's physical reach.

177. Before February 13, 2026, a reasonable City supervisor would have understood that affirmatively exposing an employee to a known, particularized danger from an armed third party, with deliberate indifference to that danger, violates the Fourteenth Amendment.

178. As a direct and proximate result of these Defendants' conduct, Joey suffered physical injury, conscious pain and suffering, and terror before his death. The Estate seeks those pre-death damages in an amount to be proven at trial, exceeding $1,000,000.

179. The Estate brings Count I as Joey's successor in interest under NRS 41.100. Monica's individual damages as Joey's heir are pleaded separately in Count III.

180. Segovia, Coonan, Myers, and Lackas acted with malice, oppression, or reckless and callous indifference to Joey's federally protected rights. Plaintiff seeks punitive damages against each of them.

181. Plaintiff seeks attorney's fees and costs under 42 U.S.C. § 1988.

**COUNT II**

**MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983: FIREARM-INVESTIGATION FAILURES, INADEQUATE THREAT-ASSESSMENT PROTOCOLS, AND SYSTEMIC WORKPLACE-VIOLENCE RESPONSE GAPS (MONELL)**

**(On Behalf of the Estate, against The City)**

182. Plaintiff incorporates by reference Paragraphs 1 through 181 as though fully set forth herein.

127. The City is an entity subject to liability under 42 U.S.C. § 1983 for constitutional deprivations caused by its policies, customs, practices, decisions, or usages. Monell v. Department of Social Services, 436 U.S. 658 (1978).

183. The City, through its policymakers, Human Resources leadership, Public Works leadership, management personnel, supervisory personnel, and officials with final or delegated authority over workplace safety, employee discipline, transfers, and workplace-violence response, maintained policies, customs, practices, decisions, and failures that were a moving force behind the deprivation of Joey's Fourteenth Amendment substantive-due-process right to life and bodily integrity.

184. The City's municipal policies, customs, practices, decisions, ratification, training failures, and supervision failures are pleaded independently and collectively in the following.

**Firearm-Investigation Failures**

185. On information and belief, the City maintained a policy, custom, or practice of treating employee reports of firearms in the workplace as ordinary personnel matters

rather than urgent safety threats requiring prompt, coordinated, documented, and effective investigation.

186. The City had notice that Kim had previously left a firearm in the DMS bathroom and that Joey thereafter reported Kim's firearm possession, steroid use, and violent conduct.

187. Despite the prior firearm incident and Joey's firearm report, City personnel failed to contact law enforcement, secure or remove the reported weapon, determine whether Kim retained workplace access to a firearm, arrange drug testing, or implement other immediate protective measures.

188. Instead of ensuring a confidential, safety-focused firearm investigation, Segovia disclosed the substance of Joey's report to Coonan, who was implicated in allegations of steroid distribution to City employees.

189. The City failed to adopt, enforce, train personnel on, or supervise compliance with a mandatory firearm-reporting protocol requiring responsible City personnel to:

a) Promptly assess and document reports that an employee possesses or has access to a firearm at work;

b) Determine whether the reported weapon is present, accessible, or subject to immediate securing or removal;

c) Notify appropriate safety, security, or law-enforcement personnel when facts indicate a credible workplace-weapons risk;

d) Preserve the confidentiality of the reporting employee while protective measures are considered and implemented; and/or

e) Take immediate interim action to protect the reporting employee from retaliation, confrontation, or violence.

190. The City's firearm-investigation failures were manifested by its handling of the known 2025 firearm incident, Joey's firearm reports, the disclosure of Joey's report, and the failure to take effective protective measures before Kim shot and killed Joey at the City work yard.

191. The City's policy, custom, practice, and deliberately indifferent failures concerning firearm investigation and response exposed Joey to a known, foreseeable, and particularized danger and were a moving force behind the deprivation of Joey's Fourteenth Amendment substantive-due-process right to life and bodily integrity.

**Inadequate Threat-Assessment Protocols**

192. The City lacked and failed to enforce an adequate protocol requiring a timely, individualized, documented threat assessment when an employee reported a coworker's firearm possession, drug or steroid use, violent conduct, intimidation, stalking, threats, escalating conflict, or fear for personal safety.

193. The City had repeated notice of facts requiring a prompt and meaningful threat assessment, including Kim's prior firearm incident; Joey's reports of Kim's firearm possession, steroid use, violent behavior, threats, intimidation, and escalating aggression; Joey's repeated transfer requests; and Joey's express statement that he feared for his life.

194. The City continued to schedule Joey and Kim at the same work yard and on the same shifts while relying on separate task assignments rather than meaningful physical separation, protective reassignment, or other measures reasonably calculated to prevent contact and confrontation.

195. The City's rejection of an emergency transfer based on a concern that other employees might request similar transfers – the implication that Joey's request was not actually an emergency, but just a whiny employee - constituted an official decision, or a

ratified custom, that prioritized administrative convenience over Joey's known and particularized safety risk.

196. On information and belief, the City's threat-assessment procedures failed to require responsible officials to evaluate and document:

a) The specificity, credibility, and immediacy of a reported threat;

b) The reported employee's access to firearms or other weapons;

c) The history of violence, intimidation, stalking, threats, or escalating conflict;

d) Whether the reporting employee faced a particularized risk of retaliation or violence;

e) Whether meaningful physical separation, reassignment, no-contact directives, security measures, or paid separation were necessary; and

f) Whether immediate escalation to officials authorized to make protective decisions was required.

197. Rather than conduct and act upon a meaningful individualized threat assessment, the City handled Joey's safety concerns through routine personnel procedures, shift-bid procedures, separate-task assignments, and disciplinary proceedings directed at Joey who was the victim.

198. The City's inadequate threat-assessment protocols, customs, practices, decisions, and training and supervision failures were deliberately indifferent to the known and particularized danger to Joey and were a moving force behind the deprivation of Joey's Fourteenth Amendment substantive-due-process right to life and bodily integrity.

**<u>Systemic Workplace-Violence Response Gaps</u>**

199. The City maintained a policy, custom, or practice of responding to credible workplace-violence reports through fragmented and routine personnel processes rather

than a coordinated safety response designed to protect employees from reported, particularized threats.

200. The City's workplace-violence response procedures failed to require confidential handling and restricted dissemination of reports concerning firearms, drugs, workplace violence, threats, intimidation, stalking, and safety fears before identifying the reporting employee to the accused employee, implicated supervisors, or coworkers.

201. The City's failure to enforce confidential reporting was manifested when Segovia disclosed Joey's firearm and steroid report to Coonan, after which Coonan publicly identified Joey as a "felon" and "snitch" and Joey was subjected to escalating hostility and intimidation.

202. The City's workplace-violence response procedures further failed to require responsible City officials to use available interim protective measures, including emergency reassignment, protective transfer, paid separation, staggered schedules, no-contact directives, security measures, and meaningful physical separation.

203. Rather than neutralize the reported danger, the City placed Joey on administrative leave, pursued disciplinary measures against him, denied his transfer requests, assigned him unsafe equipment, and continued to schedule him at the same work yard and on the same shifts as Kim.

204. The City failed adequately to train and supervise Human Resources personnel, Public Works managers, supervisors, crew leaders, and other responsible employees concerning:

a) Confidential handling of workplace-safety reports;
b) Firearm and workplace-weapons response;
c) Individualized threat assessment and documentation;

d) The distinction between routine personnel disputes and credible workplace-violence threats;

e) Protective transfers, emergency reassignments, no-contact directives, and meaningful employee separation;

f) Prevention of retaliation, intimidation, isolation, or discipline directed at employees reporting safety threats; and/or

g) Coordinated escalation of credible workplace-violence concerns to appropriate management, security, and law-enforcement personnel.

205. The City's post-incident assessment identified the need to evaluate policy and operational changes and whether compliance-training delivery methods and additional training modules required revision if gaps were identified.

206. City officials with final policymaking authority, or officials acting under delegated final authority, approved, directed, made, or knowingly acquiesced in the denial of Joey's protective transfer or reassignment; Joey's continued assignment to the same work yard and shifts as Kim; and the treatment of Joey's reports as personnel matters rather than a workplace-violence emergencies.

207. City officials with final policymaking authority ratified the conduct and decisions of their subordinates by approving, affirming, or knowingly permitting the disclosure and handling of Joey's safety reports; the failure to undertake an effective threat assessment; the denial of protective reassignment; the continued exposure of Joey to Kim; and the discipline imposed upon Joey despite the known danger.

208. The City's systemic workplace-violence-response gaps, including its policies, customs, practices, failures to train and supervise, final-policymaker decisions, and ratification, independently and collectively were a moving force behind the deprivation of

Decedent's Fourteenth Amendment substantive-due-process right to life and bodily integrity, his fatal shooting, and Plaintiff's and the Estate's resulting damages.

209. The aforementioned acts of the Defendants were the proximate cause of Joey's injuries and death.

210. Prior to his death he sustained physical injury with tremendous pain and suffering, emotional distress, and nominal damages in an amount to be proven at trial but exceeding One Million Dollars ($1,000,000).

211. Plaintiff brings this wrongful death and survivorship action in her capacity as an heir and administrator of Joey's estate for all damages recoverable under NRS § 41.085 and NRS § 41.100.

212. The acts of the City-Employee Defendants were taken with oppression, fraud or malice and/or their conduct was motivated by evil motive or intent, or involved reckless or callous indifference to the federally protected rights of others, therefore Plaintiff seeks punitive damages.

213. Plaintiff seeks attorney's fees and costs under 42 U.S.C. § 1988.

**COUNT III**

**WRONGFUL DEATH**

**(By Monica individually as heir, and by the Estate as personal representative Against All Defendants)**

214. Plaintiff incorporates by reference Paragraphs 1 through 213 as though fully set forth herein.

215. Joey's death was caused by the wrongful acts and neglect of Kim, the City, and the City-Employee Defendants.

216. Kim wrongfully caused Joey's death by assaulting, battering, and shooting Joey at the City work yard.

217. The City and the City-Employee Defendants owed Joey duties to use reasonable care in operating and supervising the City workplace and in responding to known reports of workplace firearms, drugs, threats, intimidation, retaliation, violence, and a particularized threat to Joey's safety.

218. The City and the City-Employee Defendants breached those duties by failing to investigate and respond adequately to reports of firearms, drugs, violence, stalking, intimidation, and threats; disclosing Joey's workplace-safety reports; failing to protect Joey from retaliation; failing to conduct an effective threat assessment; failing to separate Joey from Kim; denying Joey's requested transfer or protective reassignment; failing to provide adequate workplace security; and failing to implement effective workplace-violence-response measures.

219. Defendants' wrongful acts and neglect were actual and proximate causes of Joey's injuries and death.

220. When a person's death is caused by another's wrongful act or neglect, the decedent's heirs and personal representative may each maintain an action for damages against the person who caused the death and another person responsible for the wrongful act or neglect. NRS 41.085.

221. Monica, as Joey's surviving spouse and heir, and the Estate have sustained damages arising from Joey's death, including the loss of probable support, companionship, society, comfort, consortium, household services, grief, sorrow, lost earnings, benefits, and other damages recoverable by law.

222. This Count is pleaded against the City and the City-Employee Defendants acting within the scope of public employment, subject to any applicable Nevada immunity or limitation.

223. It is independently pleaded against each individual Defendant whose wrongful conduct was intentional, malicious, outside the scope of public employment, or otherwise gives rise to personal liability independent of the City's tort liability.

224. Prior to his death he sustained physical injury with tremendous pain and suffering, emotional distress, and nominal damages in an amount to be proven at trial but exceeding One Million Dollars ($1,000,000).

225. The acts of Defendants were taken with oppression, fraud or malice and/or their conduct was motivated by evil motive or intent, or involved reckless or callous indifference to the federally protected rights of others, therefore Plaintiff seeks punitive damages.

226. Plaintiff is entitled to attorney's fees, costs of suit, expert fees and interest, including attorney's fees and expert fees.

## <u>COUNT IV</u>

## SURVIVAL ACTION, NRS 41.100

## (By the Estate, against All Defendants)

227. Plaintiff incorporates by reference Paragraphs 1 through 226 as though fully set forth herein.

228. Before his death, Joey suffered physical injury, conscious pain, suffering, fear, terror, emotional distress, and economic loss because of Defendants' wrongful conduct.

229. The Estate seeks damages recoverable for Joey’s injuries and losses that survived his death, including Joey’s pre-death pain, suffering, fear, terror, emotional distress, medical expenses, funeral and burial expenses, lost earnings, lost employment benefits, and other economic and noneconomic damages recoverable by law.

230. The injuries and losses alleged in this Count were directly and proximately caused by Defendants’ conduct as alleged herein.

231. This Count is pleaded against the City and City-Employee Defendants acting within the scope of public employment.

232. It is independently pleaded against each individual Defendant whose conduct supports personal liability independent of the City’s tort liability.

233. The Estate seeks only Joey's own pre-death losses. The Estate does not seek in this Count any loss that belongs to Monica as heir under Count III.

234. The acts of Defendants were taken with oppression, fraud or malice and/or their conduct was motivated by evil motive or intent or involved reckless or callous indifference to the federally protected rights of others, therefore Plaintiff seeks punitive damages.

235. Plaintiff is entitled to attorney’s fees, costs of suit, expert fees and interest.

## COUNT V

## NEGLIGENCE; NEGLIGENT HIRING, RETENTION, SUPERVISION, TRAINING, SECURITY, AND FAILURE TO PROTECT

**(On behalf of the Estate and Monica as heir, against the City and the Supervisory Defendants)**

236. Plaintiff incorporates by reference Paragraphs 1 through 235 as though fully set forth herein.

237. The City employed Joey, Kim, and the City-Employee Defendants and controlled the Public Works workplace, supervision, work assignments, employee transfers, workplace-security measures, safety procedures, disciplinary procedures, and responses to reported threats.

238. The City and the City-Employee Defendants owed Joey duties to use reasonable care in operating and supervising the workplace and to take reasonable measures to protect him from foreseeable injury.

239. The City also assumed specific duties by adopting the mandatory protocols alleged in Paragraph 95 and by undertaking the protective actions alleged herein.

240. The City and the Supervisory Defendants breached those duties through the following operational failures:

a) Segovia failed to notify law enforcement, secure Kim's firearm, or arrange drug testing after Joey's February 13, 2026 report;

b) Segovia disclosed Joey's report to Coonan, in breach of the City's confidentiality requirements;

c) Segovia assigned Joey to a solo truck without a team leader and confined Joey with Kim on April 6, 2026;

d) the City kept Joey and Kim on shared shifts and at a shared clock-in location after Joey's reports; and

e) the City negligently performed the investigations and protective measures it undertook.

241. The City negligently retained Kim after learning of the 2025 firearm incident and Joey's reports, and negligently supervised Coonan after learning of the steroid allegations.

242. The City failed to provide security at the DMS work yard.

243. These breaches were an actual and proximate cause of Joey's death. Plaintiff seeks damages under Counts III and IV as allocated there, in an amount to be proven at trial, exceeding $1,000,000, subject to applicable statutory limits.

244. It is also pleaded against individual Defendants whose acts were outside the scope of public employment, intentional, malicious, or independently tortious.

245. The acts of the City-Employee Defendants were taken with oppression, fraud or malice and/or their conduct was motivated by evil motive or intent or involved reckless or callous indifference to the federally protected rights of others, therefore Plaintiff seeks punitive damages.

246. Plaintiff is entitled to attorney’s fees, costs of suit, expert fees and interest, pursuant to 42 USC § 1988 and all other applicable law.

**COUNT VI**

**ASSAULT AND BATTERY**

**(By the Estate, Against Kim)**

247. Plaintiff incorporates by reference Paragraphs 1 through 246 as though fully set forth herein.

248. Kim intentionally placed Joey in reasonable apprehension of imminent harmful or offensive contact through escalating intimidation, confrontations, threats, and physical attack.

249. On June 12, 2026, Kim intentionally punched, kicked, and shot Joey without consent or legal justification.

250. Kim’s conduct constituted assault and battery and directly caused Joey’s physical injuries, conscious pain, emotional distress, terror, and death.

251. Kim acted willfully, maliciously, oppressively, and with conscious disregard for Joey's rights and safety.

252. This Count is asserted against Kim personally and is not pleaded as a claim based on conduct within the scope of public employment.

253. Plaintiff is entitled to attorney's fees, costs of suit, expert fees and interest.

**COUNT VII**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(By the Estate, against Kim, Segovia, Coonan, and Myers)**

254. Plaintiff incorporates by reference Paragraphs 1 through 253 as though fully set forth herein.

255. Kim engaged in extreme and outrageous conduct by intimidating, assaulting, battering, and fatally shooting Joey.

256. Segovia engaged in extreme and outrageous conduct by disclosing Joey's firearm report to the implicated foreman and then confining Joey with Kim immediately after Kim threatened him.

257. Coonan engaged in extreme and outrageous conduct by publicly branding Joey a "snitch" after learning Joey had reported an armed coworker.

258. Myers engaged in extreme and outrageous conduct by refusing Joey's urgent transfer for administrative convenience while knowing the facts alleged herein.

259. Each of these Defendants intended to cause Joey emotional distress or acted in reckless disregard of the probability of causing it.

260. Joey suffered severe emotional distress, fear, terror, and emotional anguish before his death as a direct and proximate result of Defendants action and suffered damages in an amount to be proven at trial but exceeding One Million Dollars ($1,000,000).

261. This Count is asserted against each individual Defendant personally to the extent that Defendant's extreme and outrageous conduct was intentional, malicious, reckless, outside the scope of public employment, or independently tortious.

262. Plaintiff is entitled to attorney's fees, costs of suit, expert fees and interest.

**COUNT VIII**

**NEVADA OCCUPATIONAL SAFETY AND HEALTH WHISTLEBLOWER RETALIATION, NRS 618.445**

**(By the Estate, against the City)**

263. Plaintiff incorporates by reference Paragraphs 1 through 262 as though fully set forth herein.

264. At all relevant times, Joey was an "employee" and the City was an "employer" within the meaning of Chapter 618 of the Nevada Revised Statutes.

265. NRS 618.445 prohibits an employer from discharging or in any manner discriminating against an employee because that employee has filed a complaint, instituted or caused to be instituted any proceeding, testified, or exercised on his own behalf or the behalf of others any right afforded by Chapter 618, including reporting workplace-safety violations to a supervisor, to management, or to Nevada OSHA.

266. Joey engaged in protected activity under NRS 618.445 by, among other things:

a) reporting to Supervisor Mel Segovia on February 13, 2026 that coworker Brysen Kim was carrying a concealed firearm on City property, using anabolic steroids on the job, and engaging in violent behavior;

b) making verbal and written safety complaints to Human Resources on February 23 and 24, 2026 concerning firearms, drugs, escalating aggression, workplace violence, and fear for his safety;

c) submitting formal reports to the City Auditor, Bryan Smith, on March 24, March 31, and April 7, 2026 concerning firearms, drugs, violent behavior, threats, heat hazards, defective equipment, unsafe assignments, and retaliation;

d) reporting violations of the Heat Illness Prevention Plan and requesting breathable personal protective equipment from Supervisor Coonan on March 20, 2026, expressly referencing OSHA regulations;

e) refusing to sign pre-trip safety certifications for and refusing to operate Trucks 3868 and 4276, which had defective tailgates, missing safety chains, and nonfunctional tarps;

f) filing Nevada OSHA Whistleblower Complaint No. 26-103 on April 8, 2026, amended April 13, 2026, alleging retaliation under NRS 618.445; and

g) filing a second Nevada OSHA whistleblower complaint on May 8, 2026, amended June 9, 2026, alleging retaliation in connection with Joey's refusal to operate a work truck with defective brakes.

267. The City had actual knowledge of Joey's protected activity, as reflected by their receipt of his verbal, written, HR, City Auditor, and Nevada OSHA complaints.

268. Following, and in close temporal proximity to, Joey's protected activity, the City subjected Joey to a series of adverse employment actions, including:

a) placement on paid administrative leave on February 26, 2026, one day after his safety reports to HR;

b) issuance of a Notice of Proposed Disciplinary Action on February 27, 2026, signed by Defendant Paskey, based on Joey's peaceful, de-escalating statements ("keep it Aloha" and "bullying is no pono");

c) retaliatory assignment to defective trucks with broken tailgates, missing safety chains, and nonfunctional tarps between March 20 and April 6, 2026;

d) denial of breathable PPE and forced use of dense poly-cotton uniforms in heat conditions without acclimatization following a 21-day absence;

e) selective enforcement of the uniform policy against Joey while other employees violated the same policy without consequence;

f) assignment to crews to which Joey did not belong, denial of daily instructions, and administrative isolation from normal working conditions;

g) forced proximity to Kim on April 6, 2026, including confinement together in a 14-passenger van immediately after a threatening statement by Kim;

h) issuance of an April 13, 2026 written disciplinary write-up;

i) requiring Joey to use personal leave, or sending him home without pay, on May 8, 9, 10, 11, 15, 16, 17, 18, 22, 23, 24, 29, 30, and 31, 2026 for refusing to operate a work truck with defective brakes; and

j) issuance of a second Notice of Proposed Disciplinary Action on June 11, 2026, potentially including termination, signed by the Acting Public Works Director and scheduled for hand delivery on June 12, 2026, the day of Joey's death.

269. The temporal proximity, escalation, and pattern of the City's adverse actions demonstrate that Joey's protected activity was a substantial and motivating factor for each adverse action.

270. Plaintiff filed Nevada OSHA Whistleblower Complaint No. 26-103 on April 8, 2026 and a second Nevada OSHA complaint on May 8, 2026, and has exhausted or is excused from exhausting any administrative prerequisites to suit as to those retaliatory acts within Nevada OSHA's jurisdiction, and preserves all appeal and dual-filing rights afforded by Nevada OSHA's June 24, 2026 closure letters.

271. As a direct and proximate result of the retaliation described in this Count, Joey suffered lost wages, lost benefits, emotional distress, humiliation, fear, physical injury, and death; Plaintiff and the Estate suffered damages as alleged herein, in an amount to be proven at trial but exceeding One Million Dollars ($1,000,000).

272. Plaintiff is entitled to attorney’s fees, costs of suit, expert fees and interest.

## COUNT IX

## NEVADA PUBLIC-EMPLOYEE WHISTLEBLOWER RETALIATION, NRS 281.611 – 281.671

**(By the Estate, against the City of Las Vegas)**

273. Plaintiff incorporates by reference Paragraphs 1 through 272 as though fully set forth herein.

274. Joey was a local governmental employee and the City a local governmental agency under NRS 281.611 to 281.671.

275. Joey disclosed improper governmental action, including on-duty steroid distribution by a City foreman, a concealed firearm on City property, failure to follow the City's firearm and drug protocols, and operation of unsafe City vehicles on public roads.

276. Joey made those disclosures to the following officials, each identified by content, recipient, date, and medium:

a) verbal report to Segovia on February 13, 2026 about Kim's firearm and steroid use;

b) verbal and written reports to HR on February 23 and 24, 2026; and

c) written reports to City Auditor Bryan Smith on March 24, March 31, and April 7, 2026.

277. The City took reprisal against Joey because of those disclosures, through the adverse actions alleged herein and Coonan's public "snitch" labeling.

278. The Estate seeks all remedies available under NRS 281.611 to 281.671 in an amount to be proven at trial.

**<u>COUNT X</u>**

**RETALIATION IN VIOLATION OF NEVADA PUBLIC POLICY**

**(By the Estate, against the City, pleaded in the alternative to Counts VIII and IX)**

279. Plaintiff incorporates by reference Paragraphs 1 through 278 as though fully set forth herein.

280. Nevada recognizes a common-law tort action against an employer who takes adverse action against an employee for engaging in conduct that Nevada public policy protects or requires, including refusing to violate the law, reporting violations of law, and refusing to operate unsafe equipment for which the employee is personally responsible.

281. Joey engaged in conduct protected by strong and compelling Nevada public policy, including, but not limited to:

a) reporting the presence of a firearm and controlled substances on City property to his supervisor, Human Resources, the City Auditor, and Nevada OSHA;

b) reporting credible threats of workplace violence by coworker Kim;

c) refusing, as a CDL holder, to sign pre-trip safety certifications for and to operate City vehicles with defective tailgates, missing safety chains, and defective brakes, for which he would have been personally liable under federal and Nevada motor-carrier safety law; and

d) reporting violations of the City's Heat Illness Prevention Plan and OSHA regulations.

282. In retaliation for that protected conduct, the City and the City-Employee Defendants took adverse employment actions against Joey, including administrative leave, proposed and imposed discipline, denial of protective transfer, unsafe assignments, denial of PPE, selective uniform enforcement, isolation, forced use of personal leave, unpaid days, and constructive removal from safe working conditions.

283. Defendants' retaliatory conduct violated substantial public policies of the State of Nevada reflected in, among other authorities, NRS Chapter 618 (occupational safety), NRS 281.611–.671 (public-employee whistleblower protection), NRS 613.340 (retaliation for reporting), and federal and Nevada motor-carrier safety regulations governing CDL pre-trip inspections.

284. As a direct and proximate result, Joey suffered lost wages, lost benefits, humiliation, severe emotional distress, physical injury, and death; Plaintiff and the Estate suffered damages as alleged herein in an amount to be proven at trial but exceeding One Million Dollars ($1,000,000).

285. Defendants acted willfully, maliciously, and with conscious disregard for Joey's rights and safety, entitling Plaintiff to punitive damages against each individual Defendant whose conduct was outside the scope of public employment or otherwise supports personal liability.

286. Plaintiff is entitled to attorney's fees, costs of suit, expert fees and interest.

**COUNT XI**

**FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983**

**(By the Estate, against Segovia, Coonan, Myers, Paskey, and Curtis, individually, and the City)**

287. Plaintiff incorporates by reference Paragraphs 1 through 286 as though fully set forth herein.

288. The City-Employee Defendants acted under color of state law at all relevant times.

289. The First Amendment to the United States Constitution, as applied to state and local governments through the Fourteenth Amendment, prohibits a public employer from retaliating against an employee for engaging in speech on a matter of public concern spoken as a private citizen.

290. Joey engaged in speech on matters of public concern outside his ordinary job duties as a maintenance worker, including:

a) reports to the City Auditor, Nevada OSHA, and other outside authorities concerning firearms on City property, distribution of controlled substances at work, workplace-violence risk, defective City vehicles operating on public roads, and heat-illness/PPE violations;

b) prior OSHA advocacy that resulted in a substantiated investigation;

c) organizing activity on behalf of the Teamsters union and public advocacy for compliance with OSHA and reform of the CEA CBA; and

d) emails to seven external entities, including the Attorney General, City Auditor, and OSHA, concerning workplace safety and Kim.

291. Joey's speech addressed matters of significant public interest — the safety of City workers and members of the public, unlawful conduct by City employees, and public expenditures and management of the Public Works Department — and was not made pursuant to his official job duties.

292. Joey's interest in speaking on these matters substantially outweighed any legitimate interest of the City in promoting the efficient delivery of public services.

293. In retaliation for Joey's protected speech, the City-Employee Defendants took adverse actions against Joey that would chill a person of ordinary firmness from continuing to engage in the protected speech, including:

a) placement on paid administrative leave;

b) issuance of two Notices of Proposed Disciplinary Action, including the June 11, 2026 notice that could have resulted in termination;

c) Coonan's public labeling of Joey as a "felon" and "snitch" in front of City management, including Lackas;

d) Segovia's disclosure of Joey's confidential safety report to Coonan, the alleged steroid source;

e) Myers's blanket refusal to authorize a protective transfer;

f) retaliatory assignment to defective and unsafe equipment;

g) selective uniform enforcement, administrative isolation, and forced proximity to Kim; and

h) required use of personal leave or unpaid days on 14 dates in May 2026.

294. Joey's protected speech was a substantial and motivating factor for the adverse actions taken against him.

295. The City is liable for the retaliatory adverse actions under Monell v. Department of Social Services, 436 U.S. 658 (1978), because:

a) final policymakers, including the Acting Public Works Director, HR leadership, and Myers, made or ratified the decisions to discipline Joey, deny his transfer requests, and expose him to Kim; and

b) the City maintained policies, customs, and training and supervision failures — including treatment of protected reports as personnel matters and failure to enforce confidential reporting — that were a moving force behind the retaliation, as further alleged in Count II.

296. As a direct and proximate result, Joey suffered lost wages, lost benefits, humiliation, severe emotional distress, physical injury, and death, in an amount to be proven at trial but exceeding One Million Dollars ($1,000,000).

297. Plaintiff and the Estate are entitled to attorneys' fees and costs under 42 U.S.C. § 1988.

**COUNT XII**

**CIVIL CONSPIRACY**

**(Against Defendants Segovia, Coonan, Paskey, Myers, Lackas, Hunt, Curtis, and Kim)**

298. Plaintiff incorporates by reference Paragraphs 1 through 297 as though fully set forth herein.

299. Two or more of the individual Defendants, by concerted action, combined to accomplish an unlawful objective — the retaliatory targeting, endangerment, and silencing of Joey — for the purpose of causing him harm.

300. Overt acts in furtherance of the conspiracy include, but are not limited to:

a) Segovia's disclosure of Joey's confidential safety report to Coonan within approximately four hours of receipt;

b) Coonan's repeated public labeling of Joey as a "felon" and "snitch" in front of Lackas and other City management;

c) Paskey's issuance of pretextual discipline against Joey based on peaceful, de-escalating statements Paskey did not witness;

d) Myers's blanket refusal to authorize an emergency transfer, expressed in writing as unwillingness to "open the door" for other transfer requests;

e) HR's referral of Kim to a behavioral-health clinician and to the Acting Public Works Director on June 8, 2026 without any protective action for Joey; and

f) the issuance of a second, potentially termination-level Notice of Proposed Disciplinary Action against Joey on June 11, 2026, one day before his death.

301. Each of the Defendants named in this Count acted with intent to accomplish the unlawful objective, or with knowledge of and agreement in the objective.

302. As a direct and proximate result of the conspiracy, Joey suffered retaliation, humiliation, severe emotional distress, physical injury, and death; Plaintiff and the Estate suffered damages as alleged herein, in an amount to be proven at trial but exceeding One Million Dollars ($1,000,000).

303. This Count is asserted against each individual Defendant personally, and not as a claim based on conduct within the scope of public employment.

304. Plaintiff is entitled to attorney’s fees, costs of suit, expert fees and interest.

…

…

…

## COUNT XIII

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**(By the Estate, against the City and the Supervisory Defendants, pleaded in the alternative to Count VII)**

305. Plaintiff incorporates by reference Paragraphs 1 through 304 as though fully set forth herein.

306. The City and the Supervisory Defendants owed Joey a duty of reasonable care in receiving, investigating, and responding to his workplace-safety reports; in maintaining the confidentiality of those reports; in evaluating and acting upon his requests for protective transfer; and in operating and supervising the workplace so as to protect Joey from foreseeable emotional harm.

307. The City and the Supervisory Defendants breached those duties by, among other things, disclosing Joey's safety reports to the individuals he was reporting; publicly labeling him a "snitch"; denying his repeated transfer requests; forcing him into proximity with Kim; assigning him to unsafe equipment; and subjecting him to escalating discipline while ignoring the credible threat Kim posed.

308. It was reasonably foreseeable that Defendants' negligent conduct would cause Joey severe emotional distress.

309. Joey did in fact suffer severe emotional distress, expressly documented in a written HR complaint in which he stated: "I am being actively stalked by Brysen Kim outside of work hours . . . . The combination of his delusions, steroid use, access to a firearm, and stated gang affiliation makes his threats credible, and his behavior dangerously unpredictable . . . I am afraid for my life."

310. Joey's severe emotional distress was manifested by physical symptoms, including sustained fear, anxiety, sleep disturbance, and vigilance, and ultimately by the physical injury and death he sustained at Kim's hands.

311. This Count is pleaded in the alternative to Count VII (Intentional Infliction of Emotional Distress) to preserve theories at differing culpability thresholds.

312. The Estate seeks damages in an amount to be proven at trial, including attorney’s fees and costs.

## <u>COUNT XIV</u>

## NEGLIGENCE *PER SE* AND AIDING AND ABETTING ASSAULT AND BATTERY

**(By the Estate, against Coonan, pleaded in the alternative)**

313. Plaintiff incorporates by reference Paragraphs 1 through 312 as though fully set forth herein.

314. On information and belief, Defendant Coonan distributed anabolic steroids — Schedule III controlled substances under federal and Nevada law — to Defendant Kim and other City employees on City property during working hours or in proximity to, or directly on work property.

315. Coonan's distribution of anabolic steroids violated federal and Nevada criminal statutes prohibiting the distribution of controlled substances.

316. Those statutes are intended to protect persons in Joey's position — coworkers foreseeably endangered by drug-induced aggression — from the type of harm Joey suffered.

317. Coonan's violation of those statutes constitutes negligence *per se* and was an actual and proximate cause of Kim's escalating aggression, threats, stalking, assault, battery, and shooting of Joey.

318. In the alternative, Coonan aided and abetted Kim's assault and battery by knowingly supplying the anabolic steroids that fueled Kim's aggression, by publicly identifying Joey as a "snitch" in front of City management, and by failing to disclose the drug distribution to responsible City officials, thereby giving Kim substantial assistance and encouragement to commit the tortious acts alleged in Count VI.

319. As a direct and proximate result of Coonan's conduct, Joey suffered physical injury, conscious pain, fear, terror, severe emotional distress, and death; Plaintiff and the Estate suffered damages as alleged herein, with damages in an amount to be proven at trial but exceeding One Million Dollars ($1,000,000).

320. Coonan acted willfully, maliciously, and with conscious disregard for Joey's rights and safety.

321. This Count is asserted against Coonan personally and is not pleaded as a claim based on conduct within the scope of public employment.

322. Plaintiff is entitled to attorney’s fees, costs of suit, expert fees and interest.

**COUNT XV**

**CONSPIRACY TO DEPRIVE CIVIL RIGHTS, 42 U.S.C. § 1983**

**(By the Estate, against Segovia, Coonan, and Myers, individually)**

323. Plaintiff incorporates by reference Paragraphs 1 through 322 as though fully set forth herein.

324. Segovia, Coonan, and Myers agreed to retaliate against Joey for his protected speech and to expose him to the danger Kim posed. Each acted under color of state law.

325. The following communications show the agreement:

a) On February 13, 2026, within approximately four hours of Joey's report, Segovia and Coonan discussed the report;

b) Defendants communicated about Joey's transfer request by email, refusing it; and

c) Defendants communicated about disciplining Joey or removing him from employment.

326. Each Defendant knew the objective of the agreement and took part in it.

327. Segovia disclosed Joey's report to Coonan.

328. Coonan publicly identified Joey as a "snitch."

329. Myers refused Joey's transfer and kept him on Kim's shift.

330. Each of those acts was an overt act in furtherance of the agreement.

331. The conspiracy caused the deprivation of Joey's Fourteenth Amendment right to life and bodily integrity, alleged in Count I, and his First Amendment right to free speech, alleged in Count XI.

332. As a direct and proximate result, Joey suffered retaliation, severe emotional distress, physical injury, and death.

333. The Estate seeks compensatory damages in an amount to be proven at trial, punitive damages against each Defendant, and attorney's fees and costs under 42 U.S.C. § 1988.

…

…

…

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants, jointly and severally where permitted by law, as follows:

1) For compensatory damages under 42 U.S.C. § 1983;
2) For wrongful-death damages on behalf of Plaintiff MONICA McLEAN, individually and as Decedent’s heir;
3) For the Estate, the personal representative's special damages under NRS 41.085 and Joey's pre-death damages under NRS 41.100.
4) For the Estate, lost wages, benefits, and other remedies available.
5) Punitive damages against each individual Defendant whose conduct was malicious, oppressive, or recklessly indifferent to Joey's rights.
6) Attorney's fees and costs under 42 U.S.C. § 1988 and other applicable law.
7) Prejudgment and post-judgment interest as permitted by law.
8) Such other relief as the Court finds just.

DATED November 13, 2026.

**PI VEGAS**

By: ______________________________

CORRINE P. MURPHY, ESQ.
Nevada Bar No. 10410
9440 W. Sahara Ave., Ste. 245
Las Vegas, NV 89117
*Attorney for Plaintiffs*

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

DATED November 13, 2026.

**PI VEGAS**

By: ______________________________
CORRINE P. MURPHY, ESQ.
Nevada Bar No. 10410
9440 W. Sahara Ave., Ste. 245
Las Vegas, NV 89117
*Attorney for Plaintiffs*